Filed 6/1/15  In re Joshua H. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re JOSHUA H., a Person Coming Under the Juvenile Court Law. | B259245 (Los Angeles County Super. Ct. No. CK82633) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. C.H., Defendant; JOSHUA H., Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Anthony Trendacosta, Commissioner.  Dismissed.

Nancy O. Flores, under appointment by the Court of Appeal, for Appellant.

No appearance for Defendant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

_____

Joshua H. (Joshua), a juvenile court dependent, appeals from the juvenile court order granting his mother, C.H. (mother) reunification services. We dismiss the appeal as moot.

## BACKGROUND

When Joshua was born in January 2010, he tested positive for PCP. Mother told the nurse at the hospital she had been diagnosed when she was six years old with bipolar disorder, depression, and schizophrenia, and she had recently begun using PCP again after ten months of sobriety. Mother was on summary probation and had been in four substance abuse programs, but had relapsed every time. The department of Children and Family Services (DCFS) placed Joshua in the home of maternal grandmother (MGM), where mother had been living, with a safety plan providing that mother was not to reside there, was to enroll in an outpatient drug program, and could visit Joshua nine hours or more each week. After mother told the social worker she wanted MGM to assume legal guardianship of Joshua, and MGM provided DCFS with a copy of her petition for guardianship, DCFS closed the voluntary case in March 2010.

### 2010 Petition

After DCFS learned that mother was residing with MGM and confirmed with MGM and with mother that mother was using drugs, DCFS detained Joshua, placed him with MGM, and filed a petition on June 14, 2010 alleging failure to protect under Welfare and Institutions Code[1] section 300, subdivision (b).[2] The juvenile court sustained the petition on August 2, 2010, removing Joshua from mother's custody and ordering mother to participate in a drug rehabilitation program and other counseling, and

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Joshua's alleged father, A.A., did not participate in the court proceedings and is not a party to this appeal.

2

to have an evaluation to determine her need for psychotropic medication. On November 18, 2010, mother was arrested when sheriff's deputies found drugs in mother's bedroom in MGM's home (and MGM stated mother repeatedly broke into MGM's home, but denied mother lived there). DCFS removed Joshua from MGM's home and placed him in foster care.

Mother enrolled in a residential drug treatment facility on December 28, 2010, but tested positive for PCP twice in January 2011. Joshua was evaluated and found to have developmental delays and motor delays. Mother had attended only two weekly visits with Joshua, whose foster family was interested in adoption. When DCFS brought Joshua to the program, however, mother maintained regular visitation, and beginning late in January 2011 she tested negative. Mother cooperated with the treatment program and took her psychotropic medications regularly. On March 25, 2011, the court granted mother additional family reunification services.

Mother completed the program and moved into a sober living facility that would accept Joshua upon reunification; she visited Joshua regularly and participated in dyadic therapy. In December 2011 she remained abstinent, and had successful unmonitored visitation with Joshua at the sober living home. After a hearing on December 5, 2011, the juvenile court returned Joshua to mother at the sober living home, with family maintenance services. Mother and Joshua moved into MGM's home and in June, 2012, Joshua was doing very well, while mother continued to be sober ("fully immersed herself in recovery") and actively participated in interventions for Joshua. The juvenile court terminated jurisdiction over Joshua on June 4, 2012.

### 2012 Petition

DCFS filed a second petition twenty-two days later on June 26, 2012, again alleging failure to protect under section 300, subdivision (b). A referral on June 17, 2012 stated that mother placed Joshua in her car while appearing under the influence, drove the car erratically onto a neighbor's lawn, and crashed into a tree. Joshua was unhurt. When the social worker arrived at the scene, MGM said mother was not drunk but was not taking her medications. Mother admitted the next day that she was deeply depressed and

3

had stopped taking her medication. On the day of the accident she took one hit of PCP from an old friend while Joshua was playing on a playground, and then put Joshua into the car to drive home. She was arrested and charged with a DUI, and she tested positive on June 19. Mother consented to placing Joshua with DCFS, and reenroll in the residential treatment center. The trial court detained Joshua and gave mother monitored visitation, placing Joshua with MGM (over DCFS objection) on July 3, 2012.

Mother admitted she had relapsed without a valid excuse. Acknowledging that mother had successfully reunified with Joshua and "mother and Joshua have a great bond," DCFS also included the June 17 police report, which included two witnesses who stated that mother got out of the car after the accident and went into the house, leaving Joshua in the car; an elderly neighbor took Joshua out of the car and took him inside. The car seat was improperly installed. The emergency department report stated: "per police, neighbors report that [mother] frequently runs in the street naked, not taking care of her children." Nevertheless, DCFS recommended mother be provided with reunification services. On July 30, 2012, the court sustained the petition, declared Joshua a dependent, and ordered mother be given reunification services and monitored visitation.

A section 387 supplemental petition on September 17, 2012 reported that MGM had been hospitalized after a heart attack, and could not take care of Joshua. Mother had immediately called Joshua's former foster family, and Joshua returned to their care after he was detained. The court dismissed the section 387 petition but maintained an order for suitable placement. A report on mother's visitation with Joshua described their relationship as "warm at times, but awkward at others." Joshua continued to show a limited range of affect and his behavior was not age-appropriate, with frequent tantrums. Mother filed a section 388 petition on October 22, 2012, requesting liberalization of visits or the return of Joshua to her care. On January 2, 2013, the court granted mother overnight and weekend visits in her residential treatment facility.

In a supplemental report dated January 28, 2013, DCFS reported that mother had moved into an apartment on the treatment facility's grounds and "has now successfully completed at least 4 drug programs, which she has re-entered each time due to relapsing

4

after long periods of sobriety." (Italics omitted.) DCFS opined that Joshua was not safe with mother in spite of her compliance, given her history of relapse. The current plan was for adoption by his foster parents, and DCFS recommended that the court terminate reunification services and set a section 366.26 hearing. The court ordered additional reunification services on March 19, 2013.

A supplemental report on August 27, 2013 stated that Joshua was doing well in the foster family home but also looked forward to visits by mother, who had moved back with MGM, making good progress and testing negative. Joshua had been diagnosed with autism but had no other mental or emotional problems. Mother had demonstrated she was willing and able to have custody of Joshua, admitting her past mistakes and putting into place an appropriate support system. DCFS recommended that Joshua be returned to her care with family maintenance services. The court ordered Joshua be returned to mother's home on August 27, 2013.

In February 2014, DCFS filed a status review report stating that mother was diligent in attempting to get Joshua an individualized educational program with the school district, was in compliance with the case plan, and was able to manage Joshua well. She was testing negative, continuing with twice-weekly Narcotics Anonymous meetings, and taking her medications regularly. DCFS recommended that the court terminate jurisdiction and give mother sole legal and physical custody of Joshua. On February 25, 2014, the court terminated jurisdiction and granted mother full custody.

**2014 Petition**

Less than three months later, on May 14, 2014, DCFS reported that on May 8, 2014, it received a referral that when mother picked up Joshua from school the day before, school staff were concerned that she was "walking funny, stumbling down the stairs and continuously closing her eyes." Mother did not respond when asked about her condition; she just grunted, and appeared to be under the influence. Joshua told the reporting party that his mother beat up a housemate the night before in front of him. A social worker made an unannounced visit to the home. Mother answered the door without pants on. The social worker waited for mother to dress and entered the home,

5

where she saw large bags of trash all around. Mother said she was "'doing good'" and denied she was under the influence that day or the day before; her facial expression did not change during the entire interview. Mother agreed to a safety plan including that she would not drive Joshua to or from school until she tested clean. In a phone call the next day, mother was hysterical, and told the social worker she had called the former foster mother. She knew Joshua would be adopted and wanted the former foster family to adopt him because they loved him; mother did not drug test because she knew it would be positive. Mother came into the DCFS office, not appearing to be under the influence, and saying: "'I know you have to take him, I know I messed up, I keep messing up.'" She agreed that Joshua be removed from her care. Instead of waiting for a meeting to discuss placement, mother then stormed out of the office, and the social worker went to mother's home. The child's car seat was outside, and when mother answered the door she invited the social worker in, handing over a bag with toys in it for Joshua and saying she knew she would not see her son again. Mother did not want to return to court to request visitation. Mother gave Joshua a hug and kiss, told him she loved him and that he was leaving with the social worker, who told Joshua she was taking him to his former foster home. The social worker drove Joshua to the foster placement while he sang and said how much fun he had at the foster family home. When they arrived, Joshua ran and embraced the foster mother, who later told DCFS she was willing to provide Joshua with a permanent home.

DCFS filed a petition on May 14, 2014, once again with allegations of failure to protect under section 300, subdivision (b). The court ordered Joshua detained, with monitored visitation for mother. A July 2014 Jurisdiction/Disposition report included mother's criminal history, with misdemeanor convictions for possession, being under the influence, and battery. When the social worker arrived for a scheduled visit on June 2, 2014, mother had forgotten ever talking to the social worker and denied that she asked to have Joshua taken from her. Mother claimed she would test "'dirty'" right then, as the PCP would be in her system for thirty days; she was not in a treatment program. She wanted Joshua to come home, but she had not visited him (although she had spoken to

6

him on the phone) because she believed he had already been adopted by the foster family. In August, DCFS reported that mother had visited Joshua once, in June. Mother had missed drug tests but stated she was soon to start an outpatient drug counseling program. DCFS recommended that mother receive family reunification services.

At the jurisdictional hearing on August 5, mother pleaded no contest to the petition, and the court sustained the petition's allegations that mother's extensive unresolved history of using illicit drugs and her mental and emotional problems, coupled with her failure to take her medication, endangered Joshua. Mother enrolled in an inpatient treatment program on August 13, 2014, and tested negative twice. DCFS continued to recommend that she receive reunification services.

Before the contested disposition hearing on September 10, 2014, Joshua's counsel filed a request that the court deny reunification services to mother pursuant to section 361.5, subdivision (b)(13), which provided that reunification services need not be provided to a parent who "has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition," citing mother's repeated relapses. Mother was present at the hearing. Joshua's counsel argued that the court could not find clear and convincing evidence that reunification services would be in Joshua's best interests, as required under the statute. The foster family was eager to adopt, had an ongoing relationship with mother, and had no intention of denying Joshua visitation with mother. Mother's counsel argued that drug addiction was a lifelong struggle, mother had significant drug-free periods of time, and relapse was a symptom of recovery; and she wanted "one more chance." DCFS also argued that mother should receive reunification services.

The trial court found that there was more than substantial evidence that mother had resisted treatment under section 361.5, subdivision (b)(13): "[O]nce she's out of the dependency system . . . and . . . no one is essentially monitoring her closely and watching her, she seems to resist not just the type of services and training that she had, but also resists the mental health requirements that everybody understands and I believe even she

7

acknowledges that she needs." It was a closer issue whether it would be in Joshua's best interests to provide reunification services, but the court concluded that it would extend reunification services for two or three months: "[I]f there is not compliance with every aspect of the case plan, the court will entertain a 388 filed by either the department or [Joshua's counsel], and I will terminate reunification services at that time." The court declared Joshua a dependent and ordered reunification services, including a substance abuse program, drug testing, parenting classes, counseling, and monitored visitation. Joshua's counsel filed this appeal, asking this court to reverse the order for reunification services and remand to the juvenile court with directions that it enter an order terminating reunification services and setting the matter for a permanent plan hearing.

After briefing was complete, DCFS filed a motion to dismiss the appeal, arguing that in an order dated March 11, 2015 (of which we took judicial notice) the trial court had terminated mother's reunification services and set a hearing to select and implement a permanent plan, thus rendering moot this appeal from the order giving mother reunification services. The order reflects that DCFS filed a section 388 petition, and the parties stipulated to the recommendation in the DCFS report. The order also provided: "If the recommendation is adoption, DCFS is to discuss with the caregiver a possible post-adopt agreement," and mother's visits were to continue as previously ordered.

## DISCUSSION

Joshua argues that the appeal is not moot because mother may again request and receive services via another section 388 petition, and because his "adoption is not predestined."

In dependency cases, mootness is determined on a case-by-case basis. (*In re Dani R.* (2001) 89 Cal.App.4th 402, 404–405.) Our duty as an appellate court is to decide actual controversies by a judgment that can be carried into effect, not to give opinions on questions that are moot or to declare principles that do not affect the case in issue. (*Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541.) If, while an appeal is pending, an event occurs rendering it impossible for us

8

(even should we decide in favor of the appellant) to grant any effective relief whatsoever, we will not proceed to a formal judgment but will instead dismiss the appeal. (*Ibid.*)

"[I]f a pending case poses an issue of broad public interest that is likely to recur, the court may exercise an inherent discretion to resolve that issue even though an event occurring during its pendency would normally render the matter moot." (*In re William M.* (1970) 3 Cal.3d 16, 23.) The issues in this case are fact specific and do not pose legal questions of broad public interest. Before us is whether the trial court abused its discretion in finding that, even if section 361.5, subdivision (b)(13) applied to mother, it was in Joshua's best interest to give mother further reunification services after three relapses into drug use during Joshua's first four and a half years of life. This is not an issue of first impression and is not likely to recur in other cases.

Even if we were to reverse the juvenile court's September 10, 2014 order granting mother reunification services, those services have already been terminated, and our review of Joshua's contentions cannot afford any effective relief. (*In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1315.) We decline to exercise our discretion to resolve issues rendered moot by subsequent events. (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1403–1404.)

We conclude that Joshua's challenge to the juvenile court order granting mother reunification services is moot.

9

## DISPOSITION

The appeal is dismissed.

NOT TO BE PUBLISHED.

JOHNSON, J.

We concur:

CHANEY, Acting P. J.

BENDIX, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.